UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FORD GUM & MACHINE COMPANY, INC.
and FORD GUM SPECIALTIES, INC.,

Plaintiffs,

v.

BRIAN HEISER; BRH CONSULTING, LLC;
BRIAN BAILEY; BLCP MANAGEMENT,
LLC; LISA JAMES; AND DOES 1–20,

Defendants.

No. 25 CV 13301

Judge Georgia N. Alexakis

MEMORANDUM OPINION AND ORDER

Plaintiffs Ford Gum & Machine Co., Inc. ("Ford Gum") and Ford Gum Specialties, Inc. ("FGS") make and distribute shredded chewing gum under a license from Big League Chew Properties, LLC ("Big League Chew"). Plaintiffs believe that three Big League Chew employees and their associated entities—Brian Heiser and BRH Consulting, LLC; Brian Bailey and BLCP Management, LLC; and Lisa James— shared Ford Gum's confidential information in violation of contractual agreements and state and federal trade secrets statutes.

Defendants have filed three separate motions to dismiss: one for Heiser and BRH Consulting, [59]; one for Bailey and BLCP Management, [65]; and one for James [61]. As explained below, the Court grants in part and denies in part the motion to dismiss of Heiser and BRH Consulting; grants in part and denies in part the motion to dismiss of Bailey and BLCP Management; and grants James's motion to dismiss.

## I.      Facts[1]

Plaintiff Ford Gum makes, sells, and distributes the Big League Chew brand of chewing gum. [47] ¶ 23. It is an Illinois corporation with its principal place of business in New York. *Id.* ¶ 6. Plaintiff FGS—an affiliate of Ford Gum, *id.* ¶ 114—is a New York corporation with its principal place of business in New York. *Id.* ¶ 7. FGS owns two websites, MyBigLeagueChew.com and BuyBigLeagueChew.com, through which it sells Big League Chew products in personalized packaging. *Id.* ¶¶ 105, 109, 115. Ford Gum and FGS license the Big League Chew brand from Big League Chew. *Id.* ¶¶ 24, 56–61, 111–15.

Under the Ford Gum-Big League Chew licensing agreement, Ford Gum has the exclusive right to use Big League Chew's trademarks on gum and confectionary products until 2045, with options to renew until 2097. *Id.* ¶¶ 57, 60–61. The agreement requires Ford Gum to provide quarterly sales reports and an annual royalty report reconciling actual net sales and royalties earned. *Id.* ¶ 62. The agreement also contains a confidentiality provision. That provision states:

> All confidential and proprietary information including but not limited to client names, price lists, sales and service records, equipment, methods, improvements, data, sales figures, projections, quotations, estimates, accounting and billing procedures, other records, trade secrets, reports, budgets and other financial information, know-how and trade secrets of Licensor that are disclosed prior to the License Agreement or otherwise provided to Licensee in connection with this License Agreement, shall remain the exclusive property of Licensor, and shall be returned to

---

[1] At the pleading stage, the Court must "accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff," as it does in the discussion that follows. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). But "allegations in the form of legal conclusions are insufficient." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

> Licensor upon request and upon termination of this Agreement. … [Such information] shall be held in confidence, and shall be used only for the purposes of this License Agreement. Licensee and its employees, directors, officers, agents and representatives, shall keep confidential all confidential and proprietary information received from [Big League Chew's parent company]. …
>
> All confidential and proprietary information, know-how and trade secrets of Licensee that are disclosed or otherwise provided to Licensor hereunder shall remain the property of Licensee and shall be returned to Licensee upon request and upon termination of this License Agreement. … [Such information] shall be held in confidence and shall be used only for purposes of this License Agreement.

[49-6] at 19 § 17(a).

Defendant Brian Bailey began working with Big League Chew around August 2024, and, in 2025, his company, BLCP Management LLC, became the "managing partner" of Big League Chew. [47] ¶ 75. Bailey resides in New York, and BLCP Management has its principal place of business in New York and is organized under New York law. *Id.* ¶¶ 11–12.[2]

Defendant Lisa James was recruited by and reported to Bailey as the chief financial officer of Big League Chew. *Id.* ¶ 77. She is a resident of New Mexico. *Id.* ¶ 13.

Defendant Brian Heiser resides in Illinois, and he owns defendant BRH Consulting, LLC, which has its principal place of business in Illinois and is organized under Illinois law.[3] *Id.* ¶¶ 8–10. Heiser worked for Ford Gum from 2017 until April

---

[2] Throughout the opinion, the Court uses the name "Bailey" to refer to both Bailey and BLCP Management.

[3] Throughout the opinion, the Court uses the name "Heiser" to refer to both Heiser and BRH Consulting.

2021 as director of marketing, *id.* ¶ 27, and from April 2021 until December 2023 as vice president of sales and marketing, *id.* ¶ 28. While working for Ford Gum, Heiser had access to Ford Gum's financial information, including information about its sales, revenue, pricing, profits, and customers. *Id.* ¶ 29.

When he was hired by Ford Gum, Heiser signed a confidentiality agreement that stated:

> It is understood and agreed that Ford Gum & Machine Co., Inc. information, which may be made available to me, is to be treated as entirely confidential. Such information is not to be disclosed any [sic] person or persons, either during or after my employment. … Such information that is made available to me is to be returned to FORD GUM & MACHINE CO., INC., upon request.

*Id.* ¶ 32.

In September 2023, Heiser acknowledged receiving the newly updated Ford Gum Associate Handbook, which prohibited employees from disclosing "Confidential Information acquired in the course of [their] work," including "distributor lists," "sales … reports," and "customer information," *id.* ¶¶ 34–35, 39, as well as "records reflecting Ford Gum's … profits or performance," [49-3] at 3. Indeed, per the handbook, employees were to hold "Confidential Information in strictest confidence," to "exercise a reasonable degree of care to prevent disclosure to others," to discuss confidential information "with no one outside Ford Gum" and within Ford Gum only "on a 'need to know' basis," to obtain advance written authorization from Ford Gum before "directly or indirectly" disclosing confidential information, to refrain from "reproduce[ing] Confidential Information for any [] purpose other than in the performance of their responsibilities for Ford Gum," and to "return all Confidential

4

Information upon the end of [their] employment with Ford Gum." *Id.* ¶¶ 36–37. The handbook also required employees to inform management if they had "information [leading] them to suspect that another associate or competitor [was] obtaining the Company's Confidential Information." *Id.* ¶ 38. These obligations were weighty; any "[m]isuse or unauthorized disclosure of Confidential Information [was] cause for disciplinary action, including termination." *Id.*

After his employment with Ford Gum ended in late 2023, Heiser signed a separation agreement. *Id.* ¶ 43. Under the agreement, Heiser received a monetary payment in exchange for his compliance with several terms. *Id.* ¶ 44. Under one provision, Heiser agreed not to reproduce, use, distribute, disclose, publish, misappropriate, or otherwise disseminate any of Ford Gum's confidential and proprietary business information, including written and unwritten information not generally made available to the public or relating to Ford Gum's products, processes, associates, business, customers, pricing, or sales. *Id.* ¶¶ 46, 49. The agreement also stated that Heiser's confidentiality obligations survived the termination of the separation agreement and required Heiser to return to Ford Gum all documents, including computer files, that came from Ford Gum or that he had used during his employment there. *Id.* ¶ 51.

In 2024, Heiser began working for Big League Chew. *Id.* ¶ 55. He subsequently disclosed Ford Gum's customer and financial information to various third parties. The first disclosure was on April 28, 2025, when he sent an email with an attached document named "BLC 2023 Forecast.xlsx" to the president of CandyRific, one of Ford

Gum's competitors. *Id.* ¶ 68. The forecast contained a list of Ford Gum's customers and stated the monthly revenue that Ford Gum expected to earn from each customer in 2023. *Id.* Heiser had created the forecast in January 2023 for Ford Gum's CEO to use in Ford Gum's 2023 budgeting process. *Id.* ¶ 69. He took it with him after he left Ford Gum, *id.* ¶ 68, changing the name of the document from "Ford Gum 2023 Forecast12.29.22.xlsx" to "BLC 2023 Forecast.xlsx," *id.* at ¶ 69.

The same day, Heiser sent another document to the same person at CandyRific —his second disclosure. That other document contained Heiser's estimates of the number of cases of Big League Chew that Ford Gum sold in 2024, based on the information provided in the already-sent 2023 forecast. *Id.* ¶ 70. CandyRific shared the information that it received from Heiser with its affiliate, Hilco Sweets, another competitor of Ford Gum. *Id.* ¶ 71.

Heiser's third disclosure was on May 13, 2025. *Id.* ¶ 79. On that date, Heiser sent Ford Gum's sales data, showing "all SKUs but not by customer," to another third party, Plant Automation Group. *Id.*

Heiser's fourth disclosure was on May 19, 2025, when he sent a document called "Ford Gum's 2024 gross sales of Big League Chew," which provided Ford Gum's 2024 revenue broken down by product category, to another third party, Impact Confections. *Id.* ¶ 73. Heiser created that document using information that he copied from the annual royalty report that Ford Gum sent to Big League Chew as required by their licensing agreement. *Id.* ¶¶ 62, 72.

6

Heiser sent another document to Impact Confections four days later—his fifth disclosure. *Id.* ¶ 82. That document contained "a full sales report" broken down by customer and by product that Ford Gum sent Big League Chew after Bailey told Ford Gum that it needed more detail than Ford Gum had provided in its royalty report. *Id.* ¶ 81. Each of these five disclosures was at the direction of Bailey and BLCP Management. *Id.* ¶ 77.

Heiser's sixth disclosure, in which James and Bailey were directly involved, arose from a conversation Bailey had with a representative of one of Ford Gum's competitors, Kua LLC, on June 7, 2025. *Id.* ¶ 83. Kua, which has its principal place of business in Chicago, is related to Impact Confections (to whom Heiser made his fourth and fifth disclosures), and a representative of Impact Confections was also present for the conversation. *Id.* Bailey initiated the conversation to discuss replacing Ford Gum as the exclusive licensee of the Big League Chew trademark. *Id.*

On June 10, Bailey sent the Kua and Impact Confections representatives a thank-you email, asking them to let him know if they needed any additional information. *Id.* The Kua representative responded the same day; he asked for three years of financial statements and "a breakdown of Ford Gum's sales by sku/client." *Id.* The next day—June 11—James told Heiser in an email that she wanted to see the data that Kua asked for before anyone sent it to Kua and Impact Confections. *Id.* ¶ 84. In a follow-up email, on which she copied Bailey, James clarified that she "would like to see which client produces the what [sic] amount of sales and by which SKU for us." *Id.* ¶ 85. On June 12, Heiser sent the information to James and Bailey in multiple

spreadsheets, and that same day, Heiser and James reviewed the requested data. *Id.* ¶¶ 85–86. On June 13, Heiser sent James more information, which he identified as "the Ford sales by customer by product," and explained that it was "the raw data that Kua/Impact can analyze how they see fit." *Id.* ¶ 87.

James sent the information to Kua and Impact Confections three days later. *Id.* ¶ 88. Her email included the document from Ford Gum's annual royalty report on which Heiser had based the information in the fourth disclosure, *id.* ¶¶ 72–73, 88, as well as a document called "FORD SALES BY CUST BY SKU.xlsx," which contained information about Ford Gum's revenue and customers. *Id.* ¶ 88. Ford Gum never authorized Bailey, James, or Heiser to disclose any of its financial or customer information to third parties. *Id.* ¶ 92.

Meanwhile, starting in October 2024, Ford Gum and Big League Chew engaged in a dispute related to the promotion of FGS's "MyBigLeagueChew" website on the packaging of new Big League Chew products. Earlier that year, Ford Gum developed sour gumballs to be sold under the Big League Chew brand, which it intended to sell as a customizable product on MyBigLeagueChew.com. *Id.* ¶ 116. Ford Gum designed the packaging for the new sour gumballs to include a call-out to MyBigLeagueChew.com:

8



*Id.* ¶ 116.

Under Ford Gum's licensing agreement, all new products and their packaging were subject to Big League Chew's approval, which Big League Chew was required to grant unless it had a reasonable basis not to. *Id.* ¶ 117; [49-6] at 16 § 14(b)–(c). Ford Gum sent the gumball packaging graphics to Bailey for review and approval on October 31, 2024, and Bailey withheld approval due to the inclusion of the MyBigLeagueChew.com callout. [47] ¶ 121. He did so even though Ron Nelson, the sole owner of Big League Chew, had given his approval of the packaging design earlier that year. *Id.* ¶ 119. Bailey also disabled a link to MyBigLeagueChew.com on Big League Chew's website. *Id.* ¶ 123. Both decisions caused Ford Gum to lose sales and, according to a June 2025 email from Heiser to Bailey, undermined consumer engagement with the Big League Chew brand. *Id.* ¶¶ 122–23, 125.

Ford Gum filed this lawsuit in October 2025 and now asserts five claims: (1) misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, against all defendants, [47] ¶¶ 127–37; (2) misappropriation under the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1–9, against all defendants, [47] ¶¶ 138–48; (3)

9

breach of contract against Heiser and BRH Consulting in connection with Heiser's separation agreement, *id.* ¶¶ 149–58; (4) intentional interference with a separation agreement against Bailey and BLCP Management, *id.* ¶¶ 168–72; and (5) intentional interference with a business relationship against Bailey and BLCP Management, *id.* ¶¶ 173–81.

Defendants all move to dismiss for failure to state a claim upon which relief could be granted under Rule 12(b)(6). James and Bailey also move to dismiss for lack of personal jurisdiction under Rule 12(b)(2). The Court addresses the jurisdictional question first.

## II. Personal Jurisdiction

### A. Legal Standard

A "plaintiff need not include facts alleging personal jurisdiction in the complaint." *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020). "But 'once the defendant moves to dismiss the complaint under [Rule] 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction.'" *Id.* (quoting *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)). When, as here, a district court rules on the defendant's motion to dismiss "without the benefit of an evidentiary hearing, the plaintiff bears only the burden of making a prima facie case for personal jurisdiction." *Id.* at 392–93 (quoting *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423 (7th Cir. 2010)). "In evaluating whether the prima facie standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts

10

presented in the record' … , either by way of [the plaintiff's] complaint or other submissions." *Id.* at 393 (quoting *Purdue Rsch.*, 338 F.3d at 782).

## B.    Analysis

In a case that, like this one, involves a federal question, "a federal court has personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant." *Id.* (quoting *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hou. Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010)); *see also* Fed. R. Civ. P. 4(k). Here, the federal statute on which the Court's subject-matter jurisdiction rests, the DTSA, does not authorize nationwide service of process. *Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Sup. 3d 691, 706 (N.D. Ill. 2017). So, the Court may exercise jurisdiction over the defendants only if allowed under Illinois law and the United States Constitution. *Curry*, 949 F.3d at 393 (citing *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011)). "[T]he Illinois long-arm statute permits the exercise of personal jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause." *Id.* (quoting *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010)). The question is therefore whether the Due Process Clause would permit a court of the State of Illinois to exercise personal jurisdiction over the defendants.

Under the Due Process Clause, a state court may only exercise personal jurisdiction over a defendant with "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). That means that, unless the defendant is "essentially at home" in the forum state, *Daimler*

11

*AG v. Bauman*, 571 U.S. 117, 139 (2014), the court must have specific jurisdiction over the defendant. There are three requirements for specific jurisdiction: (1) "the defendant's contacts with the forum state [] show that it purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state"; (2) "the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities"; and (3) "any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice." *Curry*, 949 F.3d at 398 (cleaned up) (quoting *Lexington Ins. Co. v. Hotai Ins. Co., Ltd.*, 938 F.3d 874, 878 (7th Cir. 2019)). "[I]n determining whether it may exercise specific personal jurisdiction over a defendant, the Court must consider the scope of personal jurisdiction with respect to each … claim." *Sunny Handicraft Ltd. v. Edwards*, 16 C 4025, 2017 WL 1049842, at *5 (N.D. Ill. Mar. 20, 2017) (collecting cases). With these principles in mind, the Court will consider whether it has personal jurisdiction with respect to Ford Gum's claims against James and Bailey.

### 1.    Personal Jurisdiction Over James

Ford Gum has adequately pled that the Court has specific jurisdiction over James. After Bailey's initial conversation with Kua (an Illinois company), James emailed Heiser (a resident of Illinois and the owner of an Illinois-based business) telling him what information (from Ford Gum, an Illinois company) she would like to see before it was sent to Kua. [47] ¶¶ 8–10, 84–85. Heiser reviewed the data with James, which she found "extremely helpful," and it is reasonable to infer that the review occurred during some kind of remote meeting while Heiser was in Illinois. *Id.*

12

¶ 86. Heiser sent James more information from Ford Gum in another email, *id.* ¶ 87, and James sent the information to Kua a few days later, *id.* ¶ 88.

In summary, James asked an Illinois resident working from Illinois for information from an Illinois company, which she then reviewed with the Illinois resident before sending it to another Illinois company for the purpose of doing business with that second Illinois company. This sequence of actions is more than enough to establish that James "purposefully availed [herself] of the privilege of conducting business in [Illinois]" or "purposefully directed [her] activities" here. *Curry*, 949 F.3d at 398. Additionally, Ford Gum's alleged injury—the misappropriation of its financial information—arises directly from James's contacts with Illinois. In other words, because her Illinois contacts "can in no sense be viewed as random, fortuitous, or attenuated," James is subject to jurisdiction in Illinois. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 480 (1985).

This is not a case like *Walden v. Fiore*, 571 U.S. 277 (2014), upon which James relies, where "the plaintiff is 'the only link between the defendant and the forum.'" [61] at 3 (quoting *Walden*, 571 U.S. at 285). In that case, a police officer working as a Drug Enforcement Administration ("DEA") agent searched a Nevada couple's luggage in an Atlanta airport and seized a large amount of cash. *Id.* at 280. When the couple later sued the DEA agent in Nevada, the Supreme Court held that personal jurisdiction could not be premised on the DEA agent's knowledge that the couple's injury would be felt in Nevada. *Id.* It explained that a defendant's "substantial connection with the forum state … must arise out of contacts that the 'defendant

13

himself" creates with the forum State." *Id.* at 284 (quoting *Burger King*, 471 U.S. at 475). Besides the couple's residence in Nevada, the DEA agent himself had not established minimum contacts there. But here, James herself created contacts with Illinois by sending to an Illinois company information that she obtained via an Illinois intermediary from another Illinois company, communicating, it can reasonably be inferred, with individuals in Illinois throughout the process. In *Walden*, by way of contrast, the defendant never "conducted activities within, contacted anyone in, or sent anything or anyone to [the forum state]." *Id.* at 289.

Nor does *Philos Technologies, Inc. v. Philos & D, Inc.*, 802 F.3d 905 (7th Cir. 2015), bar personal jurisdiction over James. In that case, the Seventh Circuit affirmed the district court's denial of personal jurisdiction not because the plaintiffs had not conducted business in the forum state or directed its activities at the state but because the plaintiff's claims did not arise out of those contacts. *Id.* at 914 ("The suit that Philos Tech filed in Illinois does not arise out of or relate to these mostly incidental interactions that Defendants had with the state."). The defendant, a Korean company, allegedly retained equipment that the plaintiff, an Illinois company, had sent to the defendant as part of a business deal between the defendant Korean company, the plaintiff Illinois company, and a third-party Korean company that was closely related to the plaintiff Illinois company. *Id.* at 907–08.

One of the founders of the defendant Korean company traveled to Illinois months before the joint venture was proposed, and, while he was there, toured the Illinois company's facility to learn more about its work. *Id.* at 913–14. The court held

14

that the trip was irrelevant to the personal jurisdiction question because it was largely unrelated to the matters at issue in the lawsuit. *Id.* at 914–15. The founder later took another trip to Illinois for an academic conference. *Id.* While there, he toured the Illinois company's facilities a second time but did not engage in any negotiations or business discussions. *Id.* The court held that the second trip was also irrelevant to personal jurisdiction, noting that even if the defendant had discussed the business deal while in Illinois, he neither solicited the Illinois company about the deal nor traveled to the state for the purpose of conducting business with the Illinois company. *Id.* at 915 ("That Defendants made a contract with an Illinois company and may have had some conversations about it in Illinois does not outweigh the fact that they neither solicited the Illinois company to enter into an agreement nor travelled to the state for the purpose of conducting business with that company.").

The only other contact with Illinois in *Philos Technologies* was that the equipment at issue was acquired from an Illinois company, *id.* at 914, although the equipment's component parts had been outsourced from the third-party Korean company, *id.* at 915. The court held that the agreement from which the case arose was "in essence a contract for the provision of goods to a Korean company," and "[t]he mere fact that [the Illinois company] produced those goods in Illinois" was "incidental to the jurisdictional analysis." *Id.*

This case is different. Ford Gum's claims arise directly out of James's contacts with Illinois, which she initiated. Heiser did not send Ford Gum's information to James out of the blue or at the behest of some non-Illinois party. James asked Illinois-

15

based Heiser for information about an Illinois-based company, and she then sent the information to another Illinois company in response to that company's request. Unlike *Philos Technologies*, then, this was not an essentially out-of-state transaction with incidental forum state contacts; it was an essentially in-state transfer of information initiated and facilitated, at least in part, by James.

This case is also unlike *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014). *Advanced Tactical* fell under *Walden*'s reasoning because the defendant's only relevant relationship to the forum state was that the injured parties were located there. *See Advanced Tactical*, 751 F.3d at 802 (holding that the "mere fact" that defendant's conduct injured a forum-state company did "not suffice to authorize jurisdiction" (quoting *Walden*, 571 U.S. at 291)). The court also held that the defendant's marketing email list—for which consumers signed up—did not show a relevant relation between the company and the forum state, since any such relation "would be entirely fortuitous, depending wholly on activities out of the defendant's control." *Id.* at 803. Thus, the problem was that the defendant had not "targeted residents" of the forum state. *Id.* Here, unlike there, James's actions targeted Illinois, and those actions gave rise to Ford Gum's claims.

Two more cases on which James relies are distinguishable for similar reasons. *See* [76] at 1 (citing *Consol. Comm'l Controls, Inc. v. 5 Star Supply, LLC*, No. 08 C 4388, 2008 WL 5094402, at *3 (N.D. Ill. Nov. 26, 2008)); *id.* at 3 (citing *Suncast Corp. v. Thurman*, No. 25-cv-9965, 2025 WL 2483179, at *4 (N.D. Ill. Aug. 27, 2025)). Both cases involved misappropriation of trade secrets belonging to forum-state companies

16

but had no other connections with the forum state. The defendants' conduct did not directly touch the forum state in any way. *See Consol. Comm'l*, 2008 WL 5094402, at *3–*4 (holding that injury to an Illinois company resulting from conduct in Connecticut was insufficient to confer personal jurisdiction in Illinois); *Suncast Corp.*, 2025 WL 2483179, at *3 (holding that injury to an Illinois company resulting from conduct cabined to Georgia was insufficient to confer personal jurisdiction in Illinois). Here, unlike the defendants in *Consolidated Commercial* and *Suncast*, James's conduct—not just its effects—connects her to Illinois.

Nor does "maintenance of [this] suit … offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. The information at issue came from an Illinois company. [47] ¶ 6. In addition, the licensing agreement between Ford Gum and Big League Chew at this case's core requires all related disputes to be brought in the federal courts of Illinois. [49-6] at 28. "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi Metal Indus. Co., Ltd. v. Superior Ct.*, 480 U.S. 102, 114 (1987). James has not identified any serious burdens that would overcome Ford Gum's interest in litigating in the forum of its choice and Illinois' interest in protecting the trade secrets of its companies.

Ford Gum thus has made a prima facie showing of the Court's personal jurisdiction over James.

17

### 2. Personal Jurisdiction Over Bailey

Because the facts that underlie Ford Gum's misappropriation claims also underlie its claim for intentional interference with a separation agreement, *compare* [47] ¶ 129 *with id.* ¶ 140 *and id.* ¶ 169, the Court will analyze its personal jurisdiction over Bailey with respect to those claims together. It then will consider whether it has personal jurisdiction with respect to Ford Gum's claim for intentional interference with a business relationship. *See Sunny Handicraft*, 2017 WL 1049842, at *5; *Doe v. Cotterman*, No. 17 C 58, 2018 WL 1235014, at *5 (N.D. Ill. Mar. 9, 2018).

### a. Misappropriation and Intentional Interference with Separation Agreement

With respect to the claims of misappropriation and intentional interference with a separation agreement, the Court has personal jurisdiction over Bailey for the same reasons that it has personal jurisdiction over James. Bailey initiated talks with Kua, an Illinois company, to discuss replacing Ford Gum as Big League Chew's exclusive licensee. [47] ¶ 83. Bailey offered to provide information about Ford Gum to Kua, Kua took Bailey up on that offer, and James then obtained and sent information about Ford Gum to Kua, as described above. *Id.* Because Kua's initial contacts were with Bailey and not James, and Kua's information request was made to Bailey and not James, it is reasonable to infer that James's actions were at Bailey's direction. *See also* [47] ¶ 77 (James reported to Bailey). So, Bailey initiated a meeting with an Illinois company, offered to provide the Illinois company with information from another Illinois company, and worked with James and Heiser (who was in Illinois) to obtain and deliver the information. Bailey thus purposely directed his

activities at Illinois, and those activities gave rise to Ford Gum's claims of misappropriation and intentional interference with a separation agreement against Bailey.

Bailey relies on a few additional cases upon which James did not rely, but they are distinguishable. In *Lexington Insurance*, two Taiwanese insurance companies provided product-liability insurance coverage to two other Taiwanese companies that supplied parts to Trek Bicycle Corporation, a Wisconsin company. 938 F.3d at 876. The insurance agreements between the Taiwanese insurance companies and the Taiwanese suppliers each recognized Trek as an additional insured covered by the policies. *Id.* Trek's general insurer sought reimbursement for a lawsuit against Trek from the Taiwanese insurance companies in Wisconsin federal court, but the district court dismissed the case for lack of personal jurisdiction. *Id.* at 877–78. The Seventh Circuit affirmed, reasoning that neither of the Taiwanese insurers had made any contact with Wisconsin before, during, or after the formation of the contracts, as the contracts were negotiated in Taiwan between Taiwanese companies, and neither insurer solicited Trek's business or targeted the Wisconsin market. *Id.* at 879. That is unlike here, where Bailey initiated contact with an Illinois company (Kua) and directed James to provide the company with information from another Illinois company (Ford Gum) via an Illinois intermediary (Heiser), all with the goal of doing business with Illinois-based Kua.

In *Matlin v. Spin Master Corp.*, the Seventh Circuit affirmed dismissal of a contract dispute related to unpaid royalties on sales made nationwide for lack of

19

personal jurisdiction. 921 F.3d 701, 707 (7th Cir. 2019). It reasoned that sales in the forum state were not enough to confer jurisdiction because the contract, not the sales themselves, was at issue in the case, and the contract was made outside the forum state and had forum-selection and choice-of-law clauses that selected and chose a different state. *Id.* This case is entirely different, arising directly from conduct targeting Illinois, and having at its center a licensing agreement with an Illinois forum-selection clause. *See* [49-6] at 28.[4]

Bailey also argues that allegations made on information and belief cannot suffice for establishing jurisdiction, [65-1] at 4–5, but that isn't right. At this stage, Ford Gum only has to make a prima facie showing of personal jurisdiction, and the Court must credit all of Ford Gum's allegations as true unless controverted by evidence in the record. *Felland v. Clifton*, 682 F.3d 655, 672 (7th Cir. 2012). The case Bailey relies on involves a different issue. That case, *America's Best Inns, Inc. v. Best Inns of Abilene, L.P.*, had gone on appeal to the Seventh Circuit, but the appellant failed to show that the court had subject-matter jurisdiction. 980 F.2d 1072, 1073 (7th

---

[4] In *Presidio Holdings Inc. v. People Driven Technology, Inc.*, the court held that it did not have personal jurisdiction over defendants who lived, worked, and allegedly misappropriated their former employer's information outside the forum state. 24-CV-02912, 2025 WL 947946, at *4 (N.D. Ill. Mar. 30, 2025). Here, Bailey's alleged misappropriation involved conduct directly targeting Illinois.

In *Castelaz v. Estee Lauder Cos., Inc.*, some Illinois residents sued a Cayman Islands company that developed an AI tool for a makeup company's website. No. 22 CV 5713, 2024 WL 136872, at *1 (N.D. Ill. Jan. 10, 2024). The AI company's only connection with Illinois was that the plaintiffs had accessed the tool from their computers in Illinois. *See id.* at *4–*5. The court held that, because the company's Illinois contacts resulted from the plaintiffs' unilateral activity, the contacts were too "random, fortuitous, or attenuated" to give rise to personal jurisdiction. *Id.* at *5 (quoting *be2LLC*, 642 F.3d at 558). Here, Bailey's contacts with Illinois resulted from his own activity.

Cir. 1992). The court, ruling on post-argument jurisdictional memoranda, held that affidavits could only be credited as evidence if founded on personal knowledge. *Id.* at 1074. Attestations based on information and belief did not count. *Id.* Here, at the pleading stage and without having held an evidentiary hearing, allegations—even if made on information and belief—are enough. *See Howard v. Renal Life Link, Inc.*, No. 10 C 3223, 2010 WL 4483323, at *3 (N.D. Ill. Nov. 1, 2010) (collecting cases).

Ford Gum has thus made a prima facie showing of the Court's personal jurisdiction over Bailey with respect to its claims of misappropriation and intentional interference with a separation agreement.

### b. Intentional Interference with Business Relationship

The Court agrees with Bailey that it does not have specific personal jurisdiction over Bailey with respect to plaintiffs' claim of intentional interference with a business relationship. *See* [65-1] at 6.

In that claim, plaintiffs seek redress for Bailey's refusal to approve the MyBigLeagueChew.com callout on the packaging of a newly developed sour gumball to be sold under the Big League Chew brand. *See* [47] ¶¶ 116–25, 175–76. The alleged actions by Bailey that underlie that claim are Bailey's statement to Big League Chew owner Rob Nelson that "we need to start saying no to things that are important" to Ford Gum, *id.* ¶ 120; Bailey's refusal to approve the packaging design, *id.* ¶ 121; and Bailey's disabling of the link to MyBigLeagueChew.com on the BigLeagueChew.com website, *id.* ¶ 123. None of these actions were purposefully directed at Illinois, and they do not show that Bailey purposefully availed himself of the privilege of conducting business in Illinois. *See Curry*, 949 F.3d at 398.

21

"The mere fact that a defendant's conduct affects a plaintiff with connections to the forum State is not sufficient to establish jurisdiction." *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017). With respect to this claim, Bailey's only connection with Illinois is that his conduct may have affected Ford Gum, which is incorporated in Illinois. [47] ¶ 23. *May have*, because Ford Gum is not the owner of the affected website, MyBigLeagueChew.com; FGS is. *See id.* ¶¶ 115–16. And FGS is not an Illinois company at all. *See id.* ¶ 7.

There are no other Illinois connections. Bailey's denial was on behalf of Big League Chew, a Delaware company, likely made at the company's principal place of business in New York. *Delaware Entity Search,* Del. Dep't State: Div. Corps., https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx (last accessed Jul. 24, 2026).[5] And nothing in the complaint or record indicates that Rob Nelson was in Illinois when Bailey urged saying "no" to Ford Gum. If anything, the record suggests he was in Washington. *See* [49-6] at 29 (showing a Washington address for The Rob Nelson Company).

With respect to plaintiffs' claim of intentional interference with a business relationship, Bailey's sole connection with Illinois—Ford Gum's state of incorporation—is not sufficient to make a prima facie showing of personal jurisdiction. Because plaintiffs only bring this claim against Bailey, the Court dismisses it for want of personal jurisdiction.

---

[5] The Court may judicially notice this fact "because it is a matter of public record that is 'not subject to reasonable dispute.'" *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 314 (7th Cir. 2020) (quoting Fed. R. Evid. 201(b)).

22

### III. Failure to State a Claim

#### A. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need only contain factual allegations that, accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

#### B. Analysis

The Court first addresses Ford Gum's misappropriation claims before addressing its breach-of-contract claim against Heiser. The Court then addresses Bailey's remaining arguments: that the complaint must be dismissed due to improper claim splitting and that Bailey is not personally liable for conduct undertaken on behalf of Big League Chew.

##### 1. Misappropriation Claims

The defendants all contend that Ford Gum's misappropriation claims fail on the merits. "To prevail on a DTSA misappropriation claim, a plaintiff must show that (1) their information was a trade secret; (2) it was misappropriated; and (3) it was used in the defendant's business." *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 163 F.4th 1091, 1096 (7th Cir. 2026) (citing *Learning Curve Toys,*

23

*Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003)). The same rules apply to Ford Gum's ITSA claim. *See Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 613 (N.D. Ill. 2023). Defendants believe that Ford Gum has failed to plausibly plead the first two elements. *See* [61] at 6; [65-1] at 9; [68] at 6, 15.

With respect to the first element, Ford Gum has plausibly alleged that the information at issue was a trade secret. "Under the DTSA, information qualifies as a 'trade secret' if (1) the owner has taken 'reasonable measures' to keep it secret, and (2) the information derives independent economic value from the fact that it is not generally known and not readily ascertainable." *NEXT Payment*, 163 F.4th at 1096 (citing 18 U.S.C. § 1839(3); *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021)). Here, Ford Gum identifies its confidential and proprietary information ("CPI") as including "financial information, data, and documents, including … sales information, revenue information, pricing information, profit or margin information, and customer information." [47] ¶ 29. Per Ford Gum's complaint, its CPI includes the specific documents that Heiser shared with CandyRific, *id.* ¶ 68; Plant Automation Group, *id.* ¶ 79; Impact Confections, *id.* ¶¶ 73, 82; and Kua, *id.* ¶¶ 72–73, 88. According to Ford Gum, these documents qualify as trade secrets. *Id.* ¶ 128.

Ford Gum alleges that it has taken several measures to protect these trade secrets. For instance, it limited access to the information to those with a "need to know," *id.* ¶¶ 31, 36; it does not share its CPI—either internally or externally— without a confidentiality agreement, *see id.* ¶¶ 31–39; it uses password protection on the computer systems on which the CPI is stored, *id.* ¶ 31; and it requires those with

24

whom it shares its CPI to return the CPI when Ford Gum's business relationship with them ends, *see id.* ¶ 51; [49-6] at 19.

Defendants believe these measures are inadequate to provide a reasonable assurance of secrecy, [65-1] at 12–14, but each of the cases they marshal in support are distinguishable. In *DM Trans, LLC v. Scott*, the Court held that confidentiality policies, confidentiality covenants in employment agreements, and computer passwords—all of which are present here—were inadequate. No. 21 C 3634, 2021 WL 4963606, at *9 (N.D. Ill. Oct. 26, 2021). But the plaintiff company in *DM Trans* instructed defendant employees to use their personal devices for work and did not ask the defendants to delete company information from those devices when they left the company. *Id.* It also failed to disable the company email of at least one of the defendants, who continued to receive company emails on her personal device after leaving the company and joining a competitor. *Id.* The complaint reveals no similar weaknesses in Ford Gum's security measures; in particular, Heiser was asked to return all CPI when he left Ford Gum. [47] ¶ 51.[6]

In *Taylor Made Express, Inc. v. Kidd*, the information at issue was stored behind password protection, and the company handbook prohibited employees from "unauthorized use, theft or disclosure of the Company's confidential information." No. 21-CV-2903, 2024 WL 197231, at *5 (N.D. Ill. Jan. 18, 2024). But the handbook did

---

[6] The *DM Trans* court also faulted the plaintiff for alleging in broad strokes the information that constituted trade secrets, making it impossible for the court to assess the information. 2021 WL 4963606, at *9. Here, in contrast, Ford Gum identifies specific documents as CPI and trade secrets. [47] ¶¶ 68, 72–73, 79, 82.

not define "confidential information," and the company never identified any information as confidential. *Id.* The court held that "baseline password protection" was not enough, since the company made no effort to convey to those with passwords that the information was confidential or secret. *Id.* at *6. Here, in contrast, Ford Gum's handbook does define confidential information, as including, among other things, "distributor lists," "sales … reports," "customer information," *id.* ¶¶ 34–35, 39; and "records reflecting Ford Gum's … profits or performance," [49-3] at 3.

In *Fail-Safe, LLC v. A.O. Smith Corp.*, the court held that the plaintiff failed to protect its information sufficiently when it "willingly" shared information with the defendant without a confidentiality agreement. 674 F.3d 889, 893 (7th Cir. 2012). In *Arcor Inc. v. Haas*, the court concluded the same because "[t]he *only* security measure [plaintiff] took was to have its employees sign an employment and confidentiality agreement." 842 N.E.2d 265, 271 (Ill. App. 2005) (emphasis added). In *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, the company didn't even do that. 364 F. Supp. 3d 888, 898 (N.D. Ill. 2019) ("[Plaintiff's] data security was so lacking that it is difficult to identify the most significant shortcoming, but the company's failure to require those with access to its supposed trade secrets to enter into non-disclosure and confidentiality agreements has to be counted among the most fundamental omissions by the company."). At bottom, the security measures taken by the plaintiffs in each of these cases fall short of the constellation of measures that Ford Gum took here: limiting

26

access, using password protection, requiring confidentiality agreements, and demanding the return of information. *See* [47] ¶¶ 31–39, 51; [49-6] at 19.[7]

Ford Gum also has plausibly alleged the second requirement for information to be a trade secret: that "the information derives independent economic value from the fact that it is not generally known and not readily ascertainable." *NEXT Payment*, 163 F.4th at 1096. It alleges that its 2023 Forecast, customer-specific SKU data, and revenue projections and statements were not public knowledge and thus provided it a competitive edge over other companies capable of manufacturing or selling gum. [47] ¶¶ 68–69, 83, 96, 131; *see also Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1065–66 (N.D. Ill. 2020) (holding that allegations that customer and pricing information were trade secrets were sufficient because "plaintiffs must only plead the existence of trade secrets in broad strokes" in order to survive a motion to dismiss). In particular, Ford Gum alleges that the preservation of confidentiality serves, in part, to protect its status as Big League Chew's exclusive licensee. *See* [47] ¶¶ 2, 80–81, 83, 87–89, 132, 143.

With respect to the second element, Ford Gum has plausibly alleged that its trade secrets were misappropriated. The DTSA defines "misappropriation" as either the "acquisition of a trade secret of another … by improper means" or the "disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C.

---

[7] *Jackson v. Hammer* involved a hobby shop's customer contact information, which the shop stored on cards in a file box. 653 N.E.2d 809, 812 (Ill. App. 1995). The court faulted the shop for failing to keep the information under "lock and key"—a consideration that is not relevant here due to the electronic nature of the information at issue—and for failing to explain the information's confidentiality to its employees. *Id.* at 817.

27

§ 1839(5). Ford Gum alleges that Heiser shared its CPI with CandyRific, [47] ¶¶ 68–69; Plant Automation, *id.* ¶ 78; and Impact Confections, *id.* ¶¶ 73, 82. It also alleges that Heiser, James, and Bailey shared Ford Gum's CPI with Kua. *Id.* ¶ 88. It also explicitly alleges that it never consented to the disclosure of its CPI to third parties, *id.* ¶ 92, and nothing in the complaint or its exhibits suggests that it gave implied consent for such disclosures. Since Ford Gum has alleged that defendants "disclos[ed]" its information "without express or implied consent," it has plausibly alleged misappropriation of its trade secrets. 18 U.S.C. § 1839(5)(B); *see also NEXT Payment*, 163 F.4th at 1096. The three cases defendants cite in opposition do not help, as none of them involved an actual disclosure like the ones here. *See Amerikal Prods. Corp. v. Cave*, No. 24 C 11292, 2025 WL 1883915, at *5 (N.D. Ill. July 8, 2025); *PetroChoice LLC v. Amherdt*, No. 22-CV-02347, 2023 WL 2139207, at *5 (N.D. Ill. Feb. 21, 2023); *Prominence Advisors, Inc. v. Dalton*, No. 17 C 4369, 2017 WL 6988661 (N.D. Ill. Dec. 18, 2017) ("[Plaintiff] does not allege to whom [defendant] disclosed the Confidential Information, when he did so, or any other information that if true, would tend to show that [defendant] used or disclosed the information at all since his departure from employment with [plaintiff].").

Defendants separately argue that the licensing agreement between Big League Chew and Ford Gum forecloses Ford Gum's misappropriation claims because Ford Gum's sales information is "expressly carved out from" the agreement's

28

confidentiality provision.[8] *See, e.g.,* [68] at 9. The basis for defendants' argument is that the confidentiality provision contains two paragraphs: one protecting Big League Chew's information and one protecting Ford Gum's information. *See* [68] at 7–8 (analyzing [49-6] at 19 § 17(a)). The first paragraph, which pertains to Big League Chew's information, protects "[a]ll confidential and proprietary information including but not limited to client names, price lists, sales and service records, equipment, methods, improvements, data, sales figures, projections, quotations, estimates, accounting and billing procedures, other records, trade secrets, reports, budgets and other financial information, know-how and trade secrets." [49-6] at 19. The second paragraph, which pertains to Ford Gum's information, protects "[a]ll confidential and proprietary information, know-how and trade secrets." *Id.* Defendants say that by failing to include the list of items that appears in the paragraph pertaining to Big League Chew's information in the paragraph pertaining to Ford Gum's information, Ford Gum "expressly excluded" those items from its portion of the confidentiality provision. [68] at 8. If defendants are correct, that means that the pieces of

---

[8] This argument takes numerous forms. Defendants argue that the purported carveout means that Ford Gum necessarily failed to protect its information (so that the information can't be considered a trade secret) because it was obliged to share the information with Big League Chew Products, who was, they contend, entitled to share the information freely due to the carveout, [68] at 9–10; that Ford Gum was not the "owner" of the information, *id.* at 10; that Ford Gum could not derive economic value from the information not being generally known, since its economic value was circumscribed by the carveout, *id.* at 10–11; and that defendants did not "misappropriate" the information because they had Ford Gum's consent to disclose it, *id.* at 15–16. Heiser also argues that he did not have the requisite "knowledge" that he had a duty to protect the information since he was familiar with the licensing agreement and its confidentiality carveout. *Id.* at 16.

29

information they allegedly disclosed—sales figures, projections and statements, and client names—were necessarily not protected under the licensing agreement.

The Court, however, does not agree with defendants' reading of the contract. Under Delaware law,[9] "[t]he role of a court in interpreting a contract is to give effect to the intention of the parties as expressed in the agreed terms." *Life Plans, Inc. v. Sec. Life of Denv. Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015) (citing *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013)). A court must "enforce the plain meaning of the words in the contract unless the parties intended a special meaning." *Id.* (citing *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008)). A court "also must 'construe the agreement as a whole, giving effect to all [its] provisions.'" *Id.* (quoting *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)). Unless the contract is ambiguous, a court should not consider extrinsic evidence of the parties' intent. *Id.* (citing *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288–89 (Del. 2001)).

Here, the paragraph protecting Ford Gum's information sweeps broadly, protecting "*all* confidential and proprietary information." [49-6] at 19 (emphasis added). It contains no exclusionary language, making it difficult to conclude that the examples enumerated in Big League Chew's paragraph are "expressly excluded" from Ford Gum's paragraph.

---

[9] The Court looks to Delaware law in construing the licensing agreement, as it has a Delaware choice-of-law provision, [49-6] at 28. *See Meek v. Archibald & Meek, Inc.*, No. 21-cv-02397, 2021 WL 2036535, at *3 (N.D. Ill. May 21, 2021).

The inclusion of examples in the first paragraph does not necessarily imply exclusion in the next. "It is hornbook law that the use of the word *including* indicates that the specified list … is illustrative." *P.R. Mar. Shipping Auth. v. ICC*, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981). In other words, the examples enumerated in the first paragraph are encompassed within the phrase "confidential and proprietary information." They do not add to its meaning. *See Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 380 (2021) (Gorsuch, J., dissenting) ("[I]llustrative examples of more general terms are in some sense always redundant.").

To read the confidentiality provision otherwise would run afoul of the canon against surplusage. If the enumeration of items immediately preceded by "including" and also following a general phrase implies that the general phrase does not include the enumerated items on its own, then the word "including" is rendered superfluous. *See Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 n.96 (Del. 2023) ("[A]n interpretation is very strongly negated if it would render some provisions superfluous."). That is, the word "including" would have little if any bearing on the meaning of Big League Chew's paragraph.[10] The exemplars would no longer be exemplars. They would be independent, standalone terms within the confidentiality provision, untethered to the general phrase "confidential and proprietary information."

---

[10] Treating the enumerated examples as just that—illustrations showing the meaning of "confidential and proprietary information" and nothing more—does not run afoul of the rule against surplusage, as there are many reasons other than implying exclusion elsewhere why a drafter might want to illustrate a term with examples. *See Yellen*, 594 U.S. at 380 (Gorsuch, J., dissenting).

Nor does the enumeration of examples imply that the term "confidential and proprietary information" has one meaning in Big League Chew's paragraph and a different meaning in Ford Gum's paragraph. In general, the same words should carry the same meaning throughout a contract. *See Soleimani v. Hakkak*, No. 2023-0948-LWW, 2024 WL 1593923, at \*9 (Del. Ch. Apr. 12, 2024) ("The same words … used in different parts of a contract should be interpreted similarly."); 11 *Williston on Contracts* § 32:6 (4th ed.) ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons.").

In addition, the Court must "enforce the plain meaning of the words in the contract," *Life Plans*, 800 F.3d at 349, so it must give "general words … their full and fair scope," Antonin Scalia & Bryan Garner, *Reading Law* 101 (2012). To that end, the items enumerated in Big League Chew's paragraph are paradigmatic examples of confidential and proprietary information. *See, e.g.*, 18 U.S.C. § 1839(3) (defining "trade secret" as including "financial" and "business" information); 765 ILCS 1065/2(d) (defining "trade secret" as including "financial data" and "list[s] of actual or potential customers or suppliers"); Restatement (Third) of Unfair Competition § 39 cmt. d (A.L.I. 1995) ("A trade secret can [] relate to [] aspects of business operations such as pricing and marketing techniques or the identity and requirements of customers."); *id.* § 42 cmt. f ("[S]pecialized customer information that cannot easily be duplicated … may be sufficiently valuable and secret to qualify as a trade secret."). Thus, for "confidential and proprietary information" to be given its full and fair scope

32

in Ford Gum's paragraph, it must be read as consistent with its usage in Big League Chew's paragraph.

Indeed, to construe Ford Gum's paragraph as excluding every item enumerated in Big League Chew's paragraph leads to this question: What "confidential and proprietary information" remains? The list of enumerated items in Big League Chew's paragraph is long, expansive, and comprehensive, listing both business and technical information.[11] *See* [49-6] at 19. If "client names, price lists, sales and service records, equipment, methods, improvements, data, sales figures, projections, quotations, estimates, accounting and billing procedures, other records, trade secrets, reports, budgets and other financial information" are not "confidential proprietary information" for purposes of Ford Gum's portion of the confidentiality provision, *id.*, what other information would an objective, reasonable person consider as qualifying under this category? *See Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 274 (Del. 2026) ("We avoid interpretations that twist contract language and leave negotiated provisions as surplusage."); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 741 n.69 (Del. Ch. 2008) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders a portion of the writing superfluous, useless or inexplicable." (quoting 11 *Williston on Contracts* § 32:5 (4th ed.))); *Terrell v. Kiromic Biopharma, Inc.*, 338 A.3d 1272, 1276 (Del. 2025)

---

[11] Relying on the canon of *ejusdmen generis*, defendants argue that the "17-item litany in the first paragraph" is limited to BLC's financial information. [77] at 6–7. Although many of the items listed do appear focused on BLC's finances (e.g., sales figures, projections, accounting and billing procedures, and budgets), the list also includes items such as "equipment," "methods," and "improvements." [49-6] at 19. Defendants do not explain how these items fit with its theory that the 17-item litany is entirely financials-focused.

33

("Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party.").

To be sure, defendants also believe that "confidential and proprietary information," without the illustrative examples, is too vague to be meaningful and, hence, another reason why they maintain that Ford Gum's misappropriation claims lack merit. *See* [77] at 8 (citing *Triton Cons. Co. v. E. Shore Elec. Servs., Inc.*, C.A. No. 3290-VCP, 2009 WL 1387115, at *22 (Del. Ch. May 18, 2009)). But that phrase, used in Ford Gum's paragraph, immediately follows the paragraph in which the examples are provided. [49-6] at 19. Its meaning, used consistently from one paragraph to the next, is clear enough. Contrast that with the employee handbook in *Triton*. The court held that it failed to protect confidential information because it listed "[i]mproper disclosure of trade secrets or confidential information" as one of several examples of prohibited conduct with no other context or clarification anywhere in the handbook. *Triton*, 2009 WL 1387115, at *22.

Defendants say that their reading of the contract, which would not protect Ford Gum's financial and customer information, makes "commercial sense" because Big League Chew had a right to access Ford Gum's financial information in order to enforce the licensing agreement. [77] at 6 (quoting *Johnson & Johnson*, 352 A.3d at 274 (Del. 2026)); *see also* [68] at 9 ("A licensor needs broad access to sales information of its licensee in order to ensure that the licensee is complying with its license obligations, is paying required royalties, and doing so honestly."). It is true that Big League Chew had such a right, [49-6] at 25–26 § 24, but it does not follow that Big

34

League Chew would then be able to share that information with whomever it pleases. The confidentiality provision exists to allow Big League Chew and Ford Gum to share confidential information freely with each other. It does not make "commercial sense" to construe Big League Chew's right to access information as encompassing a right to share that information with Ford Gum's competitors, as Ford Gum alleges that defendants did. That is especially true here, where, Ford Gum alleges, Big League Chew shared the information in order to directly undermine the licensing agreement by replacing Ford Gum as Big League Chew's exclusive licensee. *See* [47] ¶¶ 80, 81, 83.

The unambiguous language of the confidentiality provision further forecloses this argument. It provides that the parties' "confidential and proprietary information, know-how and trade secrets … shall be held in confidence and shall be used only for purposes of [the] Licensing Agreement." [49-6] at 19. This language also precludes any argument that defendants have broad rights to distribute Ford Gum's information owing to the licensing agreement's designation of Ford Gum's information as its "property," in contrast to the agreement's designation of Big League Chew's information as its "exclusive property." [49-6] at 19.

*Johnson & Johnson*, 352 A.3d 229, which defendants invoke, does not help. In that case, a party to a contract promised in the contract that it did not rely on any statements by the other party made outside the four corners of the contract, thus barring the first party from making any fraud claims predicated on extra-contractual statements. *Id.* at 273. The court held that the other party, who made no such

35

promise, was not barred from bringing extra-contractual fraud claims. *Id.* at 274. Here, both parties—Ford Gum and Big League Chew—promised to protect each other's confidential and proprietary information, and the Court, for the reasons it already has provided, reads the two key paragraphs in the licensing agreement's confidentiality provision as even in that regard. So, there is no asymmetry in the contract here like there was in *Johnson & Johnson*.

At bottom, the plain meaning of the contract does not support defendants' position that the information they disclosed was per se excluded from the "confidential and proprietary information, know-how and trade secrets" that Big League Chew had a duty to protect.

\* \* \*

All that said, James advances a separate reason that the misappropriation claims against her fail: She did not know that the information that she shared with Kua was confidential. Disclosure without consent only constitutes "misappropriation" if done by a person who knew or had reason to know that the information was improperly acquired, "acquired under circumstances giving rise to a duty to maintain the secrecy" of the information, or derived from a person with such a duty.[12] 18 U.S.C. § 1839(5)(B). James says that Ford Gum fails to plausibly allege that she knew or had reason to know any of those things. [61] at 6–7.

---

[12] Disclosure can also constitute "misappropriation" if done by someone who used improper means to acquire the information, 18 U.S.C. § 1839(5)(B)(i), but Ford Gum does not allege that James used improper means to acquire the information she disclosed.

36

The Court agrees. Ford Gum alleges that "Defendants knew … they were prohibited from disclosing Ford Gum's confidential and trade secret information to Ford Gum's competitors." [47] ¶ 2; *see also id.* ¶ 91 ("All Defendants knew that Ford Gum's financial and customer information was confidential."). But the Court needn't credit that conclusory allegation. *Iqbal*, 556 U.S. at 665. There are no well-pleaded factual allegations suggesting that James knew or should have known that she, Heiser, or Bailey had a duty to protect the information.

It is true that some of the information that James sent Kua was contained in a document that Ford Gum had produced to Big League Chew as "Confidential" under the protective order entered in the case between Big League Chew and Ford Gum pending before another court in this District. *See* [47] ¶ 88; *see also* Agreed Confidentiality Order, *Big League Chew Props. LLC et al. v. Ford Gum & Mach. Co. Inc.*, No. 24-cv-11837 (N.D. Ill. Jan. 13, 2025), Dkt. No. 47. But James obtained the document from Heiser, who obtained it from Ford Gum's royalty report. [47] ¶¶ 72, 88. It is not reasonable to infer that Heiser copied the information from a document produced to Big League Chew's lawyers in another case, much less that James knew that he did so. Additionally, James is not a party in the other case, and there are no allegations supporting an inference that James knows the terms of the protective order in that case or has access to documents produced there.

37

Because Ford Gum has not plausibly alleged the knowledge requirement for its misappropriation claims against James, those claims must be dismissed.[13] The misappropriation claims against Bailey and Heiser may advance.

### 2. Breach of Contract

Ford Gum brings a breach-of-contract claim against Heiser, alleging that Heiser breached the confidentiality provision of his separation agreement, and seeking a refund of the consideration it paid Heiser, injunctive relief, and damages. [47] ¶¶ 149–58. "To establish a claim for breach of contract under Illinois law, a plaintiff must show: '(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages.'" *Yash Venture Holdings, LLC v. Moca Fin., Inc.*, 116 F.4th 651, 657 (7th Cir. 2024) (quoting *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007)). Heiser believes that he didn't breach the agreement. Rather, he says, the information that he disclosed was not protected under the separation agreement because the information was excluded from the licensing agreement, and the separation agreement did not specifically refer to information shared with Big League Chew under the licensing agreement. [68] at 22–23. That argument fails because its premise—that the licensing agreement excludes the information—fails for the reasons articulated above. Moreover, the separation agreement's confidentiality provision need not refer to specific documents to have effect. *See, e.g.*,

---

[13] James makes additional arguments as to why the claims against her fail, [61] at 7–9, but the Court need not address those now.

*Chi. Heights Glass, Inc. v. Phelps*, No. 22 C 0829, 2022 WL 1567026, at *3 (N.D. Ill. May 18, 2022).

Heiser also contends that Ford Gum failed to plead the damages element of its breach-of-contract claim. He first argues that Ford Gum could not "have incurred any injury when [Big League Chew] asked its agent to provide the information," since "Ford had no confidentiality rights to withhold the information from [Big League Chew]." [68] at 23–24. It is true that Big League Chew had a right to access the information. *See* [49-6] at 25–26 § 24. But as the Court already has explained, it did not have a right to share the information with the third parties with whom Heiser shared it, [47] ¶¶ 68, 73, 79, 82, 84–88. [49-6] at 19 ("All confidential and proprietary information … disclosed … to Licensor … shall be held in confidence and shall be used only for purposes of this License Agreement."). Heiser's license-agreement-based injury argument thus falls flat.

Heiser next argues that Ford "pleads no actual injury" because "there is no dispute" that Big League Chew has not replaced Ford Gum as its exclusive licensee. [68] at 24. The Court finds this argument more persuasive. "A breach of contract claim requires allegations that plaintiffs suffered an actual loss or measurable damages." *Podraza v. Nourish, Inc.*, No. 25-CV-50356, 2026 WL 1078554, at *12 (N.D. Ill. Apr. 20, 2026) (citing *Ivey v. Transunion Rental Screening Sols., Inc.*, 2021 IL App (1st) 200894 ¶ 39, 186 N.E.3d 1076, 1085).

In *Sirius Computer Solutions, Inc. v. Sachs*, for example, the plaintiff company sued its former employee for sharing confidential information with his new employer

in violation of a confidentiality agreement. 20-cv-1432, 2021 WL 1577798, at *1–*2 (N.D. Ill. Apr. 22, 2021). The employee and his new employer allegedly intended to use the information to steal five of plaintiff's accounts in order to establish a presence in a new geographic market, but plaintiff failed to allege that it had actually lost any accounts. *Id.* at *2. The court dismissed plaintiff's breach-of-contract claim for failing to "sufficiently allege an actual loss or measurable damages." *Id.* In so doing, the court rejected plaintiff's argument that it did not need to plead damages in order to obtain injunctive relief on a breach-of-contract theory. *Id.* at *3. Here, Ford Gum's failure to allege that Heiser's alleged disclosures caused it to lose its status as Big League Chew's exclusive licensee or to incur any other actual or measurable loss is like the plaintiff's failure to allege any loss of business in *Sirius*. This failure sinks Ford Gum's breach-of-contract claim.

Ford Gum does not believe that this failure is fatal to this claim. It contends that "the loss of competitive advantage and the threat of future misappropriation are sufficient to plead the elements of injury and damages." [70] at 13. But it cites no pertinent authorities in support of that assertion. The one case that it does cite, *Philips Medical System (Cleveland), Inc. v. Buan*, is a ruling on a motion for a permanent injunction following a default judgment on a DTSA claim. No. 19-cv-2648, 2023 WL 143200, at *1 (N.D. Ill. Jan. 10, 2023). It tells us nothing about the damages

40

element in a breach-of-contract claim under Illinois law, unlike *Sirius*—which does, and which Heiser cites and Ford Gum does not address.[14]

Because Ford Gum has failed to plead damages, its breach-of-contract claim is dismissed without prejudice.

### 3. Bailey's Remaining Arguments

#### a. Claim Splitting

Bailey believes that Ford Gum's claims must be dismissed due to improper claim splitting in light of counterclaims Ford Gum has asserted against Big League Chew in a separate case pending in this District before a different judge. That case is the aforementioned *Big League Chew Properties, LLC v. Ford Gum & Machine Co.*, No. 24-cv-11837 (N.D. Ill.), and it involves claims and counterclaims related to trade dress and trademark infringement.

"[A] district court has 'significant latitude' and 'broad discretion to dismiss a complaint for reasons of wise judicial administration whenever it is duplicative of a parallel action already pending in another federal court.'" *Scholz v. United States*, 18 F.4th 941, 951 (7th Cir. 2021) (cleaned up) (quoting *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 888–89 (7th Cir. 2012)). As part of that inherent authority to manage its docket, a district court may dismiss a case for improperly splitting claims from an earlier case. *See id.* (citing 18 *Wright & Miller's Federal Practice & Procedure* § 4406 (3d ed.)). The rule against claim splitting "prevents a party from splitting

---

[14] Ford Gum does not argue that the damages element is satisfied by the separation agreement's provision requiring Heiser to return the consideration paid by Ford Gum, *see* [47] ¶¶ 5, 94, 152, 154, and the Court will not make that argument on its behalf. *See Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995).

41

claims arising out of the same events into two cases, whether those claims are brought through a complaint or a counterclaim." *Medcor, Inc. v. Kelley*, No. 1:24-CV-04738, 2025 WL 2590388, at *5 (N.D. Ill. Sep. 8, 2025) (citing *Nalco Co. v. Chen*, 843 F.3d 670, 674 (7th Cir. 2016)). The rule against claim splitting requires (1) "an identity of the parties in the two suits" and (2) "an identity of the causes of action." *Scholz*, 18 F.4th at 952.

Bailey's claim-splitting argument founders on the first element. Neither Bailey nor BLCP Management is a party in the other case. Granted, identity of the parties needn't be strict; claim splitting applies as long as the new parties are in privity with the parties in the original action. *Zurich Cap. Mkts. v. Coglianese*, 383 F. Supp. 2d 1041, 1048 (N.D. Ill. 2005). It is the "identity of interest" that controls whether the parties are in privity, "not the nominal identity of the parties." *Digit. Dynamics Software, Inc. v. Eclipse Gaming Sys., LLC*, No. 18 C 892, 2018 WL 2463378, at *9 (N.D. Ill. June 1, 2018) (quoting *Chi. Title Land Tr. Co. v. Potash Corp. of Saskatchewan Sales Ltd.*, 664 F.3d 1075, 1080 (7th Cir. 2011)). The inquiry is functional and fact-specific. *Bernstein v. Bankert*, 733 F.3d 190, 226 (7th Cir. 2013).

Bailey does not dig into the facts. In his opening motion, he cites two cases suggesting that an owner of a company (specifically, an LLC or corporation) is in privity with the company when the owner has exclusive control over the company or a close alignment of interests with it. *See* [65-1] at 14 (citing *Kramer v. Stelter*, 588 F. Supp. 2d 862, 867 (N.D. Ill. 2008) ("[L]imited liability companies are in privity with their individual owners, particularly, as is the case here, when the owners have

42

exclusive control over the LLC."); *VitalGo, Inc. v. Kreg Therapeutics, Inc.*, No. 16-cv-5577, 2017 WL 1163741, at \*7 (N.D. Ill. Mar. 29, 2017) (holding that the founder, owner, and president of a company was in privity with his company)). But he does not explain why that means that he and BLCP Management are in privity with Big League Chew until his reply brief, where he takes issue with Ford Gum's assertion that Bailey and BLCP Management "have no ownership interest" in Big League Chew. [78] at 6 (quoting [71] at 15). Bailey replies: "Plaintiffs know this is an untrue statement because they allege that 'in or about 2025, BLCPM became the "managing partner" of Big League Chew.'" *Id.* (quoting [47] ¶ 75). Bailey also cites his initial disclosure under Rule 7.1 of the Rules of Civil Procedure, which states that "Bailey is the sole member of BLCP Management, LLC" and "an employee of non-party Big League Chew Properties, LLC" and that "BLCP Management is a member of non-party Big League Chew Properties, LLC." [27].

There are a couple of problems with Bailey's argument, which relies on the concept of ownership.[15] First, Ford Gum's complaint asserts that Rob Nelson is the sole owner of Big League Chew. [47] ¶ 119. The Court must credit that statement as true at this stage, even in the face of conflicting evidence.[16] *Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

---

[15] Privity may be found on bases other than ownership. *See e.g.*, Restatement (Second) of Judgments § 39 (A.L.I. 1982) ("A person who is not a party to an action but who controls or substantially participates in the control of the presentation on behalf of a party is bound by the determination of issues decided as though he were a party."). But Bailey has not argued for any other such bases. [78] at 6–7.

[16] Claim splitting, like res judicata, is an affirmative defense. *Blue Note, Inc. v. City of Chicago*, No. 23-cv-648, 2025 WL 2762601, at \*6 (N.D. Ill. Sep. 25, 2025) (citing *Medcor, Inc.*,

In addition—the second problem—Bailey's Rule 7.1 disclosure provides no detail about the nature of any ownership interests that Bailey or BLCP Management might have in Big League Chew. That matters because, under Delaware law, "membership" is a flexible concept that may but need not confer various ownership interests. For example, "a person may be admitted to a limited liability company as a member … without making a contribution … to the limited liability company," and, more crucially, "a person may be admitted to a limited liability company as a member of the limited liability company without acquiring a limited liability company interest.[17] Del. Code tit. 6, § 18-301(d). The Court cannot simply rely on Bailey's Rule 7.1 disclosure without knowing how Big League Chew's LLC agreement defines BLCP Management's membership. *See Obeid v. Hogan*, No. CV 11900-VCL, 2016 WL 3356851, at *5–7 (Del. Ch. June 10, 2016) (explaining that under Delaware law, "the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members" and that "[o]ne 'attraction of the LLC form of entity is the statutory freedom granted to members to shape, by contract, their own approach to common business "relationship" problems.'" (quoting *Haley v. Talcott*, 864 A.2d 86, 88 (Del. Ch. 2004))); *Achaian, Inc. v. Leemon Family*

---

2025 WL 2590388, at *3). It may therefore only serve as grounds for dismissal in a Rule 12(b) motion if it is clear from the face of the complaint. *Holmes v. Marion Cnty. Sheriff's Off.*, 141 F.4th 818, 822 (7th Cir. 2025). In addition, the statements asserted within the Rule 7.1 disclosure are not judicially noticeable facts because they are not beyond dispute. *See Federated Mut.*, 983 F.3d at 314 (citing Fed. R. Evid. 201(b)).

[17] A "limited liability company interest" is "a member's share of the profits and losses of a limited liability company and a member's right to receive distributions of the limited liability company's assets." Del. Code tit. 6, § 18-101(10).

44

*LLC*, 25 A.3d 800, 802–03 (Del. Ch. 2011) ("[A]ny conflict between the provisions of the [Delaware LLC Act] and an LLC agreement will be resolved in favor of the LLC agreement."). The record therefore does not contain enough information to find Bailey and BLCP Management to be in privity with Big League Chew. *See Bernstein*, 733 F.3d at 226 ("[W]hether there is privity … is a functional inquiry in which the formalities of legal relationships provide clues but not solutions." (quoting *Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 971 (7th Cir. 1998))).

Because Bailey has failed to show that either he or BLCP Management is in privity with Big League Chew, the Court denies without prejudice his motion to dismiss on claim-splitting grounds.

### b. Personal Liability

Bailey contends that he cannot be personally liable for any of the claims against him because was acting on behalf of Big League Chew. Agents of corporations "are generally shielded from liability by the corporation for acts undertaken on its behalf." *Creation Supply, Inc. v. Cherrie*, 61 F.4th 511, 513 (7th Cir. 2023). But that protection does not apply to the DTSA, which provides for individual liability. *See, e.g.*, *TB Food USA, LLC v. Am. Mariculture, Inc.*, No. 2:17-cv-9-FtM-29NPM, 2022 WL 3028061, at \*5 (M.D. Fla. Aug. 1, 2022) (citing 18 U.S.C. § 1839), *vacated on other grounds by PB Legacy, Inc. v. Am. Mariculture, Inc.*, 104 F.4th 1258 (11th Cir. 2024). The relevant language of the Illinois statute is substantially the same. 765 ILCS 1065/2(b) (defining "misappropriation" as acquisition or disclosure by a "person"). This contention therefore does not shield Bailey from liability with respect to Ford Gum's misappropriation claims.

45

Bailey is, however, shielded from liability for the remaining claim against him: tortious interference with Heiser's separation agreement. "Illinois recognizes a conditional privilege for corporate officers" that allows them to "interfere with a contract where they use business judgment to act on behalf of their corporation." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) (citing *Nation v. Am. Cap., Ltd.*, 682 F.3d 648, 651–52 (7th Cir. 2012)). The privilege for corporate agents "is conditional, meaning that it will not shield a corporate officer from liability if the reason a corporate officer interfered with a contract was either to further his personal goals or to injure a party to the contract, *and* his actions were not in the best interests of the corporation." *Id.* (emphasis in the original) (citing *Nation*, 682 F.3d at 653). It is a plaintiff's burden to plead facts overcoming the conditional privilege. *See Creation Supply*, 61 F.4th at 514.

Ford Gum alleges that Bailey disclosed its information to Ford Gum's competitors in order to "induce them to replace Ford Gum as the exclusive licensee" of Big League Chew. [47] ¶ 80; *see also id.* ¶¶ 81, 83. Those allegations do not reasonably support the inference that Bailey acted to further his own goals or injure Ford Gum, rather than to achieve some other corporate goal. Even if they did, Ford Gum does not allege that any interference by Bailey in Heiser's separation agreement was against Big League Chew's interest.[18]

---

[18] In its response brief, Ford Gum contends that it did so allege, but it only points to allegations relating to Bailey's alleged interference with FGS's contract with Big League Chew, not Heiser's contract with Ford Gum. *See* [71] at 8 (citing [47] ¶¶ 118–26).

Because Bailey cannot be held liable for any alleged interference in Heiser's separation agreement, that claim must be dismissed.

## IV. Conclusion

For the foregoing reasons, the Court grants in part and denies in part the motion to dismiss of Heiser and BRH Consulting [59], grants in part and denies in part the motion to dismiss of Bailey and BLCP Management [65], and grants James's motion to dismiss [61]. The claims against James are dismissed without prejudice. The misappropriation claims may proceed as to defendants Heiser, BRH Consulting, Bailey, and BLCP Management. The breach of contract claim against Heiser and BRH Consulting is dismissed without prejudice. The intentional interference claims against Bailey and BLCP Management are dismissed without prejudice.

ENTER:

_____
Georgia N. Alexakis
United States District Judge

Date: 8/7/2026

47